IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DANIEL WANTOCK,

                                   Plaintiff,                  OPINION AND ORDER

    v.

                                                             14-cv-741-wmc

NANCY A. BERRYHILL, Acting Commissioner
of Social Security,

                                  Defendant.

---

Under 42 U.S.C. § 405(g), plaintiff Daniel Wantock seeks judicial review from the denial of his application for disability insurance benefits by defendant Nancy A. Berryhill, the Acting Commissioner of Social Security. Specifically, plaintiff seeks remand on the basis that the Administrative Law Judge ("ALJ") erred as a matter of law by failing to (1) account for all of his limitations in formulating his residual functional capacity ("RFC") and (2) establish a foundation for the testimony of the vocational expert ("VE"). (Dkt. #10.) Because the court agrees that the ALJ did not account properly for all of plaintiff's work-related limitations in determining his RFC, this case will be remanded to the Commissioner for further proceedings.

# BACKGROUND[1]

### A. Claimant

Born on September 11, 1966, Daniel Wantock was 45 years old on December 31, 2011, the date on which he was last insured. (AR 11, 18.) Wantock has at least a high school education, and he speaks English. (AR 18.) His past relevant work is as a dump truck driver and construction worker. (AR 17.) Beginning on October 1, 2010, however, Wantock claims he was rendered disabled by ulcerative colitis, a condition which causes him cramping, pain, loose stools and the need to go to the bathroom frequently.

### B. Medical Records

On October 5, 2009, Wantock visited a physician with complaints of an "upset, gurgly stomach," gas and diarrhea that he had been experiencing for four weeks. (AR 189.) Roughly a year later, on October 7, 2010, Wantock reported to another physician, noting an increased number of bowel movements over the preceding several months, from one to two per day, up to five to ten, and a loss of fifteen pounds between February and June 2010. (AR 194.) That physician ordered a colonoscopy and referred Wantock to a specialist. (AR 195.)

Gastroenterology notes dated November 3, 2010, indicate a formal diagnosis of ulcerative colitis based on the results of Wantock's colonoscopy, which was performed on October 28, 2010. (AR 197.) The November notes also indicate improvement in Wantock's symptoms, including frequency of bowel movements, stool firmness, energy

---

[1] Unless otherwise noted, all cites are to the Administrative Record ("AR"). (Dkt. #9.)

levels and abdominal pain, all of which was attributed to his taking Prednisone as prescribed after the colonoscopy. (AR 198.)

Even so, Wantock was experiencing diarrhea two to three times per day with abdominal pain, as reported to Heather J. Chial, M.D., during a visit on January 6, 2011. (AR 200.) Wantock followed-up with a phone call to Chial on January 10, 2011, reporting that his symptoms were getting worse, particularly diarrhea "about every hour" each night, despite taking Prednisone and Apriso daily and doing "well" for eight to twelve hours during the day. (AR 216.) The following month, another physician noted after a visit on February 7, 2011, that Wantock was experiencing no significant change and having three to ten bowel movements per day, typically between 1 a.m. and 10 a.m. (AR 201.) While notes from that same physician dated a week later indicated a recent diagnosis of "Clostridium difficile infection," Wantock also reported that his symptoms were getting better, as he lessened his dose of Prednisone and started taking a new medication for the infection, including six to seven bowel movements at night. (AR 202-03.) On his last day taking medicine for the infection, February 24, 2011, Wantock reported stable symptoms, including five to six bowel movements per day. (AR 220.)

After seeing another physician, Kenneth Horth, M.D., on March 18, 2011, Wantock began taking Floragen for his ulcerative colitis. (AR 205.) During an April 25, 2011, follow-up appointment, Horth noted that Wantock was having two to four bowel movements per day and feeling better. (AR 206.) Wantock's improvement in symptoms continued, as noted on June 3, 2011 (AR 208), and June 15, 2011, when he expressed no

interest in taking maintenance medication despite his physician's recommendation (AR 211-12).

By July 28, 2011, however, Wantock had experienced another downturn in symptoms. A note on that date indicates that Wantock called with an update, including that he was having twelve to fifteen loose stools per day and had lost four pounds. (AR 228.) After a visit on August 4, 2011, Wantock began "infusion" treatment with Remicade, which produced some improvement. (AR 229-30.) In particular, Wantock reported having at least four to six bowel movements per day, at a November 2, 2011, follow-up visit (AR 232), and similar symptoms at a follow-up on January 4, 2012 (AR 233). Similarly, on February 16, 2012, Wantock reported having six to eight stools per day, with some being urgent (AR 263), and four to seven on March 23, 2012 (AR 266). He was also "doing fairly well" on September 24, 2012, according to a note made by Sherry Ekobena, PA-C. (AR 277.)

Unfortunately, Ekobena noted more variable symptoms in her notes following Wantock's visit on December 17, 2012. (AR 283.) Specifically, she noted that Wantock had five to nine stools each day and experienced discomfort, and he had an increased number of bowel movements and tiredness three to four days per week. (*Id.*) Ekobena referred Wantock to medical nutrition therapy, where he was seen by Diane Kelbel, R.D., on January 7, 2013. (AR 284.) At that visit, Wantock reported having three to eight bowel movements per day, with the majority in the morning and the others sporadically during the afternoon. (*Id.*) Kelbel recommended that Wantock focus on having a more consistent nutritional intake. (AR 285.) Kelbel also made similar observations regarding

4

Wantock's diet during a visit on April 2, 2013, following Wantock's report of four to six bowel movements per morning. (AR 298.)

The next day, Ekobena filled out an "Irritable Bowel Syndrome Residual Functional Capacity Questionnaire." (AR 288-91.) She indicated that Wantock had frequent stools and a stable prognosis, but also observed that he had repeatedly refused another colonoscopy to determine whether he had an "active disease."[2] (AR 288.) Ekobena left blank in the questionnaire whether she had any opinions regarding work-related limitations Wantock may have, including any resulting from his need for bathroom breaks. (AR 289-91.)

After examining Wantock's medical record, state agency medical consultant Janis Byrd, M.D., opined that he was restricted to "a medium RFC with *unlimited* [a]ccess to a bathroom facility." (AR 150 (emphasis added).) State agency consultant Mina Khorshidi, M.D., reached the same conclusion after her review of Wantock's medical record. (AR 168.)

### C. ALJ's Decision

Following an evidentiary hearing on July 11, 2013, the ALJ issued a written opinion dated August 9, 2013, concluding that Wantock was not disabled. (AR 19.) At the first step of the Social Security Administration's evaluation process, the ALJ found that Wantock did not engage in substantial gainful activity between his alleged onset

---

[2] In her notes following a visit on March 26, 2013, Ekobena indicated that Wantock refused to have another colonoscopy because he believed he contracted an infection from the one performed in October 2010. (AR 301.)

date of October 1, 2010, and December 31, 2011, his date last insured. (AR 13.) At the second and third steps, the ALJ found that Wantock had a severe impairment of ulcerative colitis without equaling the severity of one of the "listed" impairments. (*Id.*) At the fourth step, the ALJ found Wantock "had the residual functional capacity to perform light work . . . except he needed to work indoors within 100 feet of a restroom facility." (*Id.*) The ALJ further found that Wantock was "unable to perform any fast-paced production requirements, which is defined as constant activity, with tasks performed sequentially in rapid succession." (AR 13-14.)

The ALJ explained that he arrived at Wantock's RFC by giving "some weight" to Byrd's, Khorshidi's and Ekobena's opinions, since they were "generally consistent with one another and with the medical record," while adjusting downward to light work to account for his "continual subjective complaints and ongoing treatment." (AR 17.) Further explaining his finding that Wantock was able to perform "a wide range of light work," the ALJ pointed to medical notes indicating "the effectiveness of treatment in significantly improving his symptoms," as well as Wantock's "varied activities of daily living, general non-compliance with dietary advice, and non-compliance with treatment advice." (*Id.*) Some of the activities that the ALJ mentioned in particular included Wantock's household chores, grocery shopping, nature watching and attending church. (AR 16.) Finally, at step four, having limited Wantock to light work, the ALJ determined that he could not perform his past relevant work. (*Id.*)

At the fifth and last step, the ALJ relied on in-person testimony from the VE to find that Wantock was capable of performing other jobs in the national economy,

including "finger print clerk," "cleaner/housekeeper" and "office helper." (AR 18.) During the hearing, the VE offered these jobs as available for a hypothetical claimant with the RFC formulated by the ALJ, including the limitation that the individual "work indoors within 100 feet of a restroom facility." (AR 65-66.)

After the VE offered her opinion regarding a hypothetical claimant with Wantock's RFC, the ALJ asked about the maximum length of time a typical employer would tolerate an employee being off task "for any reason," to which the VE suggested twenty percent of an eight-hour work day, in addition to scheduled breaks. (AR 67-68.) The ALJ then asked the VE about the maximum number of times per month a typical employer would tolerate an employee's absence. (AR 68.) The VE stated that most employees could be absent no more than eight days per year, and she also testified that most employees could not expect to keep a job if they were absent once every month in the six months after starting a new job. (*Id.*)

Following up, Wantock's attorney asked the VE whether an employer would permit an employee to take three or more unscheduled bathroom breaks of an average of twenty minutes in a workday. The VE responded that "unscheduled breaks are not normally tolerated," and "if it's a physical issue, it would have to be an accommodation." (AR 69.) In an attempt to clarify, the ALJ then asked the VE whether employers typically accommodate employees with irritable bowel syndrome "under the ADA or otherwise," to which the VE replied, "yes." (*Id.*) After another follow-up question from Wantock's attorney, the VE suggested that an employer could accommodate for an

7

employee's need for twenty-minute bathroom breaks by having him work an additional hour. (AR 70.)

OPINION

Plaintiff Wantock raises two challenges on appeal. First, he argues that remand is required because the ALJ's RFC failed to account adequately for his bathroom break limitations. Second, he argues that the ALJ cannot rely on the VE's testimony at step five of his analysis, having neglected to lay a proper foundation for her testimony. Because plaintiff is entitled to remand based on the former argument, the court will address it first and the second argument only briefly.

I. RFC and Bathroom Break Limitations

In determining the RFC, the ALJ found that Wantock was capable of light work with two limitations: (1) he must work indoors within 100 feet of a bathroom; and (2) he could not do work requiring "tasks performed sequentially in rapid succession." Citing treatment notes, plaintiff argues that neither of these limitations accounts for his need to take unscheduled bathroom breaks due to his ulcerative colitis. In response, defendant contends that those notes do not require a finding that Wantock needs frequent, unscheduled bathroom breaks, especially since a number of the notes cited post-date December 31, 2011, his last-insured date by which Wantock must show that he was disabled. Defendant also argues that the ALJ's RFC determination is properly based on the totality of the medical evidence.

8

The court finds defendant's arguments in support of the ALJ's RFC determination unpersuasive. As an initial matter, although defendant argues that plaintiff relies too heavily on medical evidence of disability for the period after his last-insured date, the ALJ himself cites medical records from 2012 and 2013 in his decision. (AR 16-17.) Plus, the Seventh Circuit has acknowledged the common sense principle that evidence of a claimant's condition after his last-insured date can be relevant in determining whether he was disabled as of that date. *See Parker v. Astrue*, 597 F.3d 920, 925 (7th Cir. 2010); *Halvorsen v. Heckler*, 743 F.3d 1221, 1225 (7th Cir. 1984). Perhaps in recognition of this case law, defendant does not in any event argue that the evidence to which plaintiff cites is irrelevant or unreliable, so the court will not reject plaintiff's challenge to the ALJ's opinion on that basis alone.

By finding that Wantock needed to work in close proximity to a bathroom in determining his RFC, the ALJ clearly found the need for some bathroom-related limitation based on his ulcerative colitis, presumably including the need for unscheduled breaks. The ALJ failed to explain how he arrived at that particular limitation, but the inspiration likely came from plaintiff Wantock's response to a question at the hearing, which suggested that he may be able work full time if permitted to work "in proximity to a restroom." (AR 61.) Although it requires further speculation, and the defendant does not argue it, the bathroom proximity limitation may also have been inspired by the state agency consultants' opinions that Wantock have "unlimited access to a bathroom facility," although the ALJ's limitation is arguably more *restrictive* than the medical record would necessarily require. (AR 150, 168.)

Even if the ALJ's bathroom proximity limitation is supported by aspects of the record, however, proximity to a bathroom is only one component of *access*, which may reasonably account for Wantock's sometimes urgent need to go to the bathroom. The predictability, frequency and length of bathroom breaks are additional components, and as the VE acknowledged, these components are material to an individual's ability to maintain full time employment. Moreover, there is support in Wantock's treatment records for his assertions that he would need to take several, unscheduled bathroom breaks throughout the work day, and that these breaks could last in excess of twenty minutes. (*See, e.g.,* AR 288 (Ekobena's RFC assessment noting "frequent" stools).)

During the hearing, the ALJ referenced notes in Wantock's medical records indicating that his bowel movements often occurred at night, but the ALJ did not attack the credibility of Wantock's testimony that he may need to take up to six bathroom breaks lasting twenty to twenty-five minutes during an eight-hour work day, nor does there appear any basis to do so on this record.[3] (AR 62-63.) Indeed, the ALJ did not even mention Wantock's hearing testimony regarding the unpredictability, frequency and length of bathroom breaks in his decision, which further suggests that he failed to appreciate that the bathroom proximity limitation did not account for all of Wantock's work-related limitations caused by his ulcerative colitis. The failure of the ALJ to address

---

[3] The ALJ's discussion of Wantock's daily activities does not amount to a credibility finding as to his need for bathroom breaks during the work day. *See Bardgett v. Apfel*, 175 F.3d 1019, No. 98-1755, 1999 WL 239340, at *7 (7th Cir. Apr. 21, 1999) (Rovner, J., dissenting) (unpublished table decision) ("The ability to function at home where one can control one's schedule and access the bathroom at will is not inconsistent with a contention that one needs six to eight bathroom breaks a day."). Nor does defendant argue otherwise.

these limitations is particularly troubling given the VE's testimony that the unpredictability of these breaks may render him unemployable.

Finally, defendant generally concedes plaintiff's argument that the ALJ cannot rely on the VE's testimony that Wantock's employer would be required to make ADA accommodations for his need to take sudden, frequent and sometimes lengthy bathroom breaks to support a finding that he is not entitled to disability insurance benefits. Instead, defendant argues that because the ALJ asked the VE about a hypothetical claimant with Wantock's RFC *before* asking about ADA accommodations, the ALJ did not base his decision at step five on an implicit finding that Wantock was able to work with those accommodations. This argument, however, does not address the ALJ's failure to explain how Wantock's RFC incorporated all of his work-related limitations.

Thus, even though it is doubtful that a limitation regarding proximity to the bathroom could serve as an adequate proxy for limitations regarding the frequency and length of unexpected bathroom breaks, the ALJ's failure to articulate his reasoning regarding these aspects of Wantock's bathroom-related limitations alone requires remand. *See Durr-Irving v. Colvin*, 600 F. App'x 998, 1003-04 (7th Cir. 2015) (remanding when "the ALJ recounted Durr-Irving's testimony about how frequently she uses the bathroom and experiences bladder leakage but said nothing about that testimony when analyzing Irving's impairments; the ALJ didn't *discredit* the testimony but instead ignored it altogether") (emphasis in original); *Hill v. Astrue*, 295 F. App'x 77, 82-83 (7th Cir. 2008) (remanding when the ALJ found that the claimant's urinary frequency was "episodic," yet failed to "include allowances for unscheduled breaks in the RFC"); *see*

11

*also Patty v. Barnhart*, 189 F. App'x 517, 520 (7th Cir. 2006) (noting VE's testimony that the jobs identified for the hypothetical claimant "would not tolerate the long bathroom breaks (of 10 to 30 minutes) that [the treating physician] included in his RFC assessment"). Lacking any basis in the ALJ's decision or the medical record to conclude definitively that the outcome on remand would be the same, the court further agrees with plaintiff that remand is required for the ALJ to provide a sufficient explanation of Wantock's bathroom-related limitations, including the frequency and length of unexpected bathroom breaks needed during the work day.

## II. Foundation for the VE's Testimony

Having already determined that remand is required for an adequate explanation of Wantock's bathroom-related limitations in his RFC, the court notes briefly that plaintiff fails to establish the need for remand based on his second challenge.[4] Plaintiff argues that the ALJ failed to establish a foundation for the VE's testimony at the hearing by asking her about the source for the number of jobs she opined were available, and thus failed to carry the Commissioner's burden of proof to establish that plaintiff was able to perform jobs existing in significant numbers in the national economy at step five. As defendant correctly points out, however, plaintiff's argument relies on a misinterpretation of cases like *Voigt v. Colvin*, 781 F.3d 871 (7th Cir. 2015), and *Browning v. Colvin*, 766 F.3d 702 (7th Cir. 2014). Although critical of the Social Security Administration's

---

[4] The court addresses this issue briefly, simply to provide guidance to the parties and ALJ on remand. Obviously, the ALJ is free to revisit the foundation for any of the VE's opinions as he or she sees fit consistent with the rules of evidence applicable at a disability hearing and the exercise of discretion.

continued reliance on the outdated Dictionary of Occupational Titles ("DOT"), neither case overruled precedent permitting ALJ's to rely on unchallenged VE testimony. *See Adamec v. Berryhill*, No. 15 C 11811, 2017 WL 1196920, at *6 (N.D. Ill. Mar. 31, 2017). Thus, despite the mounting number of circuit court cases criticizing the reliance on the job figures reported by the DOT, the court is aware of no case requiring remand for that reason alone. *See Fitzgerald v. Colvin*, No. 15-cv-135-bbc, 2016 WL 447507, at *11 (W.D. Wis. Feb. 4, 2016).

ORDER

IT IS ORDERED that the decision of defendant Nancy A. Berryhill, Acting Commissioner of Social Security, denying plaintiff's application for disability benefits is REVERSED AND REMANDED under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. The clerk of court is directed to enter judgment for plaintiff and close this case.

Entered this 28th day of November, 2017.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Court Judge